IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DANIEL T. LIPSCOMB, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:20cv00411 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| SUPERINTENDANT JAMES F. WHITLEY, | ) | United States District Judge |
| *et al.*, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Daniel T. Lipscomb, a Virginia inmate proceeding *pro se*, filed a civil rights action

pursuant to 42 U.S.C. § 1983, alleging that officials at the Northwestern Regional Adult

Detention Center ("NRADC") in Winchester, Virginia, held him in segregated confinement for

more than seven months under harsh living conditions without due process.  Lipscomb asserts

that, in doing so, the defendants violated his rights under the Constitution and state regulations.

The court stayed this action for additional briefing on whether Lipscomb was a pretrial detainee

or a convicted felon during the events at issue.   After review of the record, the court concludes

that the defendants' motion for summary judgment must be granted.

I.  BACKGROUND

**A.  Plaintiff's Allegations**

Lipscomb alleges that on February 4, 2020, he was "placed on max custody and 30 days

of disciplinary segregation due to a[n] administrative violation."  (Am. Compl 2, Dkt. No. 9.)  He

also alleges that Superintendent James F. Whitley, Captain Heath Custer, and Lieutenant Saville

told him that after he had served his disciplinary segregation sentence, he would remain in

maximum ("max") custody for ninety days, pursuant to the "hearing board" decision made by

Custer and Saville.  (*Id.*)  Lipscomb complains that he was not given notice or a hearing

regarding the classification proceeding during which he was designated as a max custody inmate.

1

Lipscomb allegedly wrote to Saville and Custer several times in April 2020, asking for release from max custody, but received no response. He states, "I was then given two (2) false writeups to hold me longer on long-term segregation. I watched as 4 other inmates received weapon writeups [and] none were placed on max custody." (*Id.* at 3.) He alleges that one inmate charged for a weapon received only forty-two days in segregation before returning to the general population, and two others charged with assaulting jail officials served only thirty days in segregation. Lipscomb filed a grievance on May 5, 2020, complaining about this disparity of treatment and the denial of a hearing on his max custody status. Custer responded that Lipscomb was in long-term segregation based on his criminal record, which included pending charges of assault on law enforcement. Saville and Custer advised Lipscomb that each inmate's maximum custody status is reviewed regularly but that an inmate has no right to a hearing on these matters.

On May 14, 2020, Saville allegedly told Lipscomb that his due process rights had not been violated and that he was abusing the grievance process by filing so many complaints. Allegedly, "Lt. Saville then confiscated Mr. Lipscomb's wedding ring in retaliation to Mr. Lipscomb for filing the grievance[s]." (*Id.* at 4.) In July 2020, Custer advised Lipscomb that a review board had reconsidered his custody status every thirty days and would continue to do so, but that Lipscomb had no right to be present at such proceedings. Custer allegedly told Lipscomb that Custer and Whitley could keep him in long-term segregation as long as they wanted. Lipscomb complains that his long months in segregation violated policies of the Virginia Department of Corrections ("VDOC") and the NRADC. (*Id.* at 6.)

Lipscomb also asserts that while classified as max custody he was "the only person in a 5 cell housing unit no communication with nobody." (*Id.* at 7.) He alleges that officials have provided him with "inadequate provision for exercise" and "unsanitary housing [with] no water to flush the toilet. . . . A toilet flush is every 2 (two) hours or more." (*Id.* at 8.) Lipscomb

claims that officers often flushed his toilet only two times in twenty-four hours, so he had to eat his meals with feces in the toilet.  He complains that the only exercise allowed to him was for one hour and fifteen minutes per day in the five-cell unit, but he could not exercise outdoors, in the gymnasium, or in a dayroom.  Lipscomb asserts that the Virginia Administrative Code, 6 VAC 15-45-970, requires that inmates in a special housing unit should receive a minimum of one hour of exercise three separate days per week, supervised and outdoors, weather permitting. Lipscomb claims that he had no outdoor exercise opportunity for seven months.

## B.  Defendants' Evidence

In support of the motion for summary judgment, the defendants offer declarations from Custer, the captain of security and operations at NRADC ("Custer Decl." and "Suppl. Custer Decl."); Saville, formerly the NRADC lieutenant of security and operations ("Saville Decl."); and Whitley, NRADC Superintendent ("Whitley Decl.").  (*See gen.* Mem. Supp. Mot. Summ. J., Dkt. No. 36; Add'l Evid. and Brief, Dkt. No. 108).  From these statements, attached documentation, and the record, the court summarizes the defendants' evidence in the light most favorable to Lipscomb as the nonmovant.

When Lipscomb was booked into the NRADC, he was facing active charges from the Winchester Circuit Court and show cause capiases for the potential revocation of his probation for six prior convictions in Prince William County.  (Custer Suppl. Decl. ¶ 1, Dkt. No. 108-1.) The pending Winchester Circuit Court charges included two counts of assault on law enforcement, failure to register as a sex offender, probation violations, preventing law enforcement from making an arrest, and resisting arrest.  (Custer Decl. ¶ 7; Exh. D.)  According to online court records, the underlying Prince William County offenses were attempted robbery (amended to abduction to extort money), unauthorized use of a vehicle, three convictions of credit card theft, and one conviction of possession of a deadly weapon as a prisoner.

NRADC classifies its inmates for custody level and housing assignment using an objective system consistent with 6 Va. Admin. Code § 15-40-20.  (Custer Decl. ¶ 2; *id.* Ex. A, Standard Operating Procedure ("SOP") 4.03, Dkt. No. 36-1.)  Administrative review and periodic reclassification decisions are built into the system and are designed to consider both the potential security risks posed by the inmate and his individual treatment needs.  Classification evaluation criteria include "current offense, prior convictions, history of assaultive behavior, escape history, prior institutional adjustment, court status and pending charges, mental health or medical treatment history or needs, [and] identified stability factors."  (Custer Decl. ¶ 2.)

NRADC has three levels of custody:  minimum, medium, and maximum.  Inmates classified as maximum custody require "special custodial supervision because of a high probability of attempted escape and/or violent or other dangerous behavior that presents a serious threat of bodily harm to staff, other inmates or persons." (*Id.* at ¶ 3.)  An inmate who receives 21 classification points or more will normally be assigned maximum custody.  Maximum custody is not a punitive status, but such inmates are subject to greater security requirements than other inmates, including a requirement that their housing and recreation be in a segregated confinement unit, separate from other inmates.  Otherwise, a maximum custody inmate is afforded the same privileges that inmates in other custody status levels enjoy, such as television, canteen, visitation, and so on.  (*Id.*at ¶¶ 3-4.)

On the other hand, NRADC inmates serving terms of disciplinary segregation temporarily lose privileges otherwise available to inmates, including those on maximum custody status.  "A Disciplinary Hearing Board may place inmates who have committed rule violations in disciplinary segregation after notice and a hearing."  (*Id.*at ¶ 5.)  Yet, under NRADC policies, inmates in disciplinary segregation "receive the same meals as those in general population, have the same hygienic living conditions[,] . . . clothing, linens, a blanket, a hygiene kit, a writing kit,

4

and access to a sink and toilet at all times." (*Id.* at ¶ 6.)  In disciplinary segregation, inmates "are not permitted to participate in recreation outside of their assigned housing unit," but they "receive 1.25 hours leisure out of [their] cell[s] daily [in] order to shower and exercise." (*Id.*)

On January 27, 2020, NRADC officials initially designated Lipscomb as a medium security inmate, despite his score of 21 classification points, based on his criminal history and pending charges.  On February 2, 2020, Lipscomb was charged with violating a jail rule by possessing a weapon.  Specifically, an officer reported that Lipscomb had removed and concealed blades from a jail-issued razor and replaced the blades with tin foil.  Lipscomb received notice of that charge, attended a hearing on February 4, 2020, and was found guilty of the infraction.  The hearing officer imposed a penalty of thirty days of disciplinary segregation and thirty days loss of privileges (visitation, canteen, and recreation).  (*Id.,* Ex. E.)  Because this disciplinary infraction increased Lipscomb's classification points above 21, NRADC officials also reclassified him to maximum custody status.[1]  (*Id.*, Ex. F.)

On February 27, 2020, officials charged Lipscomb with another rule violation: making a false statement.  After notice and a hearing, an officer found Lipscomb found guilty and penalized him with twenty days of disciplinary segregation and twenty days loss of privileges. Again, on March 23, 2020, officials charged Lipscomb with a rule violation: possession of a weapon.  After notice and a hearing, an officer found him guilty and penalized him with thirty days of disciplinary segregation and thirty days loss of privileges.  After each such disciplinary proceeding, Lipscomb had an opportunity under NRADC policy to appeal the proceeding and penalties.  Lipscomb served his disciplinary segregation terms for these disciplinary infractions

---

[1]  The defendants' evidence is that that on February 4, 2020, officers provided Lipscomb a copy of a document signifying that decisionmakers had changed his custody status from medium to maximum.  A clip of video footage that the defendants have provided depicts officers sliding a document under the door of Lipscomb's cell on this date.

consecutively.  Thus, from February 6 until April 26, 2020, Lipscomb was serving disciplinary segregation terms.  (*Id.* at ¶ 10; Ex. E.)  After April 26, 2020, he remained in the segregation housing area because of his maximum custody status.

On June 10, 2020, an officer charged Lipscomb with another rule violation: destruction of property.  The next day, officers charged him with three additional rule violations: two counts of making threats and one count of disorderly conduct and destruction of property.  Lipscomb received notice of each of these four charges, and, after a hearing on each charge, an officer found him guilty.  For these infractions, officers imposed penalties of thirty days of disciplinary segregation and thirty days loss of privileges, and Lipscomb had a chance to appeal.

On September 26, 2020, officials removed Lipscomb from disciplinary sanctions two weeks early for good behavior.  (Custer Decl. Ex. E.)  Thus, from June 13 until September 25, 2020, Lipscomb served disciplinary segregation terms and was denied privileges according to the disciplinary penalties imposed.  From September 26 until October 26, 2020, he remained in segregation because of his maximum custody status.  On October 26, 2020, however, officials reduced Lipscomb's security status to medium custody and removed him from segregated confinement.  (Custer Decl. at ¶ 15.)

Defendants provide evidence that during all times when Lipscomb was housed in segregation, whether because he was serving a disciplinary sanction or because of his maximum custody status, the segregation review board periodically reviewed his status.  These reviews noted the reason for his segregation, his behavior and adjustment in segregation, and his compliance (or noncompliance) with rules.  The defendants' evidence indicates that the board's periodic reviews were, in turn, reviewed by the classification supervisor, with a final review by the chief of security.  Moreover, the evidence indicates that the superintendent conducted

monthly reviews of Lipscomb's segregation status, including a medical review.  (*Id.* at ¶ 11; Ex. G & H.)

NRADC policy does not require that inmates must be given notice of, or a chance to participate in, the periodic segregation reviews.  Once an inmate has been assigned a classification status, such as maximum custody, however, he may appeal that classification by submitting an inmate request form and checking a box requesting review of his classification status.  The Inmate Handbook explains this appeal procedure.  Such classification appeals are reviewed by the chief of security pursuant to SOP 4.03.  (*Id.* at ¶ 12; Ex. I.)

## C.  Complaint and Pending Motions

Lipscomb filed his § 1983 complaint in July 2020.  He submitted the present amended complaint in late August 2020, suing Whitley, Custer, and Saville.  Liberally construed, the amended complaint asserts that the defendants (a) violated his rights to procedural due process related to segregated confinement; (b) treated him differently than other segregation inmates in violation of equal protection; and (c) subjected him to harsh living conditions in violation of his right be free from cruel and unusual punishment.  He also asserts a claim (d) that Saville retaliated against him for filing grievances by confiscating his wedding ring.  As relief, Lipscomb seeks monetary damages for the alleged past deprivations of his rights and liberties.[2]

The defendants filed their motion for summary judgment (Dkt. No. 35), arguing qualified immunity and lack of merit.  Lipscomb responded.  Lipscomb also filed his own motion for summary judgment (Dkt. No. 59), which the defendants opposed.  In February 2022, the court

---

[2]  Lipscomb also sought injunctive relief to order his removal from segregated confinement.  It is undisputed, however, that on October 26, 2020, officials reduced Lipscomb's security status to medium custody and removed him from segregated confinement.  (Custer Decl. at ¶ 15.)  Therefore, Lipscomb's request for injunctive relief is moot.  *Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007) ("Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, . . . he no longer has a legally cognizable interest in a judicial decision on the merits of his claim" for injunctive relief).

stayed the case and directed additional briefing on whether Lipscomb was a pretrial detainee or a convicted felon at the time that his § 1983 claims in this case arose. The defendants then filed additional evidence and briefing on the issue of Lipscomb's status (Dkt. No. 108), and Lipscomb filed an opposition brief (Dkt. No. 110).[3] After review of the record, the court concludes that these motions are ripe for consideration.

## II. DISCUSSION

### A. The Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

---

[3] Lipscomb has also recently filed motions seeking court review of the pending motions, which will be granted as part of this review.

**B. Qualified Immunity**

"Generally, qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions." *Raub v. Campbell*, 785 F.3d 876, 880–81 (4th Cir. 2015). "Qualified immunity attaches when an official's conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam).[4]  A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam).  Although the court need not "require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct., at 551.  Using case-specific facts, the qualified immunity analysis considers "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Raub*, 785 F.3d at 881.  However, the court need not address both of these inquiries and can take them in "the order . . . that will best facilitate the fair and efficient disposition of each case." *Id.*

**C. Pretrial Detainee or Convicted Felon**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  To establish a procedural due process violation in this case, Lipscomb must first demonstrate that he had a protected liberty interest in avoiding solitary confinement. *Smith v. Collins*, 964 F.3d 266, 274 (4th Cir. 2020).  A convicted prisoner "does not have an inherent,

---

[4] The court has omitted internal quotation marks, alterations, and citations here and throughout this memorandum opinion, unless otherwise noted.

constitutionally protected liberty interest in [avoiding or] release from solitary confinement." *Id.* at 275. Thus, first, "he must identify a state-created liberty interest in avoiding solitary confinement," by showing "a basis for an interest or expectation in state regulations" for avoiding such confinement, and second, [he must show] that the conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life." *Id.* (applying principles outlined in *Sandin v. Conner*, 515 U.S. 472 (1995)). Moreover, when a convicted inmate challenges the constitutionality of living conditions in jail, his claims arise under the Eighth Amendment, and the court must employ the analysis derived from that amendment. *See, e.g., Farmer v. Brennan,* 511 U.S. 825 (1994); *Wilson v. Seiter*, 501 U.S. 294 (1991)*.*

On the other hand, a pretrial detainee who complains of segregated confinement without due process and/or unconstitutional living conditions is entitled to analysis of his claims under a different constitutional rubric. Generally, "a pretrial detainee has a right under the Due Process Clause to be free from punishment before his guilt is adjudicated." *Tate v. Parks*, 791 F. App'x 387, 390 (4th Cir. 2019) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Therefore, when a pretrial detainee asserts a claim of being subjected to segregated confinement without due process, the court must address it under the Due Process Clause, rather than using the Eighth Amendment analysis applicable to a convicted felon's claims. *Id.*

Lipscomb asserts that the defendants maintained him in segregated confinement for months in violation of his constitutional rights as a pretrial detainee. He rests his claim of pretrial detainee status on the fact that the Prince William County judge has postponed his probation revocation hearing, based on the future trial of the pending Winchester charges. Indeed, state court records available online indicate that the Prince William County Court has granted defense motions for continuances of probation revocation proceedings on six charged probation violations until October 2022, related to Lipscomb's past convictions for credit card

theft, prisoner possession of a weapon, unauthorized use of a vehicle, and attempted robbery.  As to these probation violation charges, the state court has not yet adjudicated Lipscomb's guilt or innocence.  Regarding the underlying criminal charges for which the probation terms were imposed, however, the state court has already adjudicated Lipscomb's guilt.  Herein lies a dilemma.

Neither the United States Supreme Court nor the Fourth Circuit has issued a published opinion deciding whether parolees or probationers facing revocation proceedings qualify for legal purposes as pretrial detainees or convicted felons.  *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (noting the "uncertainty about whether [a detainee awaiting a hearing on a probation violation] was a pretrial detainee or a convicted prisoner"); *Johnson v. Cannon*, No. C.A. 4:08-776-PMD, 2010 WL 936706, at *5–6 (D.S.C. Mar. 15, 2010) ("It is unclear as to whether or not the Magistrate Judge was correct in treating Plaintiff, a probation violator, as a convicted prisoner and analyzing his claims under the Eighth Amendment.  It appears the Fourth Circuit has not answered this issue. . . ."), *aff'd*, 390 F. App'x 256 (4th Cir. 2010)).  "[T]he state does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."  *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977); *see also Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").  In short, where the state has "secured a formal adjudication of guilt" for the crime underlying an inmate's probation, but it has not yet secured "a formal adjudication" that the inmate has violated his probation and should be returned to state custody, the question of the inmate's status is not clearly defined by law for purposes of procedural process rights during incarceration.  *See Brown*, 240 F.3d at 388.

### 1. Equal Protection and Prison Conditions

Whether Lipscomb was a pretrial detainee or a convicted felon does not significantly alter the applicable legal analysis for Lipscomb's claim that the defendants allegedly treated him differently than other inmates in violation of equal protection principles. The court also concludes that, regardless of his status (pretrial detainee or convicted felon), the defendants did not impose unconstitutional living conditions on Lipscomb.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). To prove an equal protection violation, prisoner litigants must demonstrate that the jail's alleged unequal treatment of similarly situated individuals does not "serve[ ] a legitimate state interest" or is not "rationally related" to any such interest. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989).

In Lipscomb's complaint and subsequent pleadings, he contends that other inmates at NRADC had serious underlying criminal charges or disciplinary infractions, without being classified to maximum custody status. His allegations fail to demonstrate, however, that any of these other inmates had the same combination of serious criminal charges (past and present) *and* the number and type of disciplinary infractions that Lipscomb had. As such, he has not demonstrated that he and these other inmates were similarly situated in all relevant respects for purposes of an equal protection analysis. Therefore, the court will grant the defendants' summary judgment motion as to Lipscomb's equal protection claims.

Similarly, the court finds that Lipscomb's claim of unconstitutional living conditions must be dismissed because it is without merit.

12

"[A] pretrial detainee has a right under the Due Process Clause to be free from punishment before his guilt is adjudicated." *Tate*[, 791 F. App'x at 390] (citing *Bell*[, 441 U.S. at 535]).  An individual pretrial detainee may raise a substantive due process challenge to his conditions of confinement "where they are so disproportionate or arbitrary that they are not related to legitimate penological objectives and amount to punishment." *Id.* (citing *Williamson*[, 912 F.3d at 174-76]).  "To prevail on such a claim, a detainee must show that the challenged treatment or conditions were either (1) imposed with an express intent to punish, or (2) not reasonably related to a legitimate nonpunitive objective, in which case an intent to punish may be inferred." *Id.* (citing *Williamson*, 912 F.3d at 178).

*Whitener v. Rutherford Cnty. Det. Ctr.*, No. 1:21-CV-00048-MR, 2021 WL 4295321, at *5 (W.D.N.C. Sept. 21, 2021).  Moreover, while a pretrial detainee cannot be punished by living conditions, not every "inconvenience encountered during pretrial detention amounts to punishment in the constitutional sense." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (citing *Bell*, 441 U.S. at 537 & n. 16).

For practical purposes, courts analyze a pretrial detainee's prison conditions claims under the two-factor inquiry set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994).  *See Brown v. Harris*, 240 F.3d 383, 388–903 (4th Cir. 2001).  First, the detainee must show that he was detained under conditions posing a "substantial risk" of "objectively, sufficiently serious" harm. *Id.* at 389.  Second, the detainee must show that the government official acted with "deliberate indifference." *Id.*  Deliberate indifference is a subjective standard:

a prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.

Lipscomb does not allege facts showing that officials imposed maximum custody status on him with the express intent to punish him before his conviction on the pending criminal charges.  Rather, the defendants' uncontradicted evidence demonstrates that during Lipscomb's

13

incarceration at NRADC, officers charged him for, and found him guilty of, committing several disciplinary infractions, including one involving possession of a makeshift weapon.  Adding this safety-threatening infraction to Lipscomb's past criminal history and his pending criminal charges, NRADC officials assessed him as posing a risk of harm to other inmates.  Thus, they increased his classification to maximum security status and required that he be separated from other inmates for safety purposes.  It is self-evident that this higher segregation status as imposed on Lipscomb, given his infraction involving a weapon and serious past and pending charges, was rationally related to maintaining security among the facility's inmate population.  The evidence also reflects that this status change was intended as temporary, pending future assessments of Lipscomb's behavior as time passed.  Similarly, the terms of disciplinary segregation were intended as temporary and were also clearly related to protecting others from his behaviors.

Moreover, in the context of prison conditions, Lipscomb has not stated facts showing that any of the living conditions imposed on him, while in maximum custody or disciplinary segregation, posed a substantial risk of sufficiently serious harm to him.  *Brown*, 240 F.3d at 389. Other than the temporary loss of television and commissary privileges, Lipscomb primarily complains that in the segregation housing, he could not exercise outdoors.  It is undisputed, however, that he had an opportunity to exercise daily outside of his cell during his time in segregation.  It is also undisputed that the terms when Lipscomb remained in segregation merely because of his maximum custody status were limited—from April 26 to June 10, 2020, and from September 26 to October 26, 2020.  Furthermore, "It is well settled that jails may provide space for indoor exercise and recreation as an alternative to outdoor recreational facilities, absent medical evidence demonstrating a need for outdoor exercise." *Jones v. Kelly*, No. 89–6651, 1990 WL 33936, at *1 (4th Cir. Mar.8, 1990) (citing *Clay v. Miller*, 626 F.2d 345 (4th Cir. 1980)).  Because Lipscomb clearly had the opportunity to exercise outside his cell and he alleges

no resulting medical issues from the temporary lack of outdoor exercise, the court concludes that the defendants' summary judgment motion as to Lipscomb's prison conditions claims must be granted.

### 2. Procedural Due Process

Lipscomb's remaining § 1983 claims allege denial of due process protections. He complains that the defendants placed him in segregated confinement for disciplinary reasons and then, at other times, kept him segregated in maximum security status for weeks, allegedly without providing him constitutionally required procedural protections. On these claims, the court must also grant summary judgment to the defendants.

> Jail officials may impose nonpunitive restrictions on a pretrial detainee for disciplinary or administrative reasons, but, as these restrictions implicate a detainee's liberty interests, he is entitled to certain procedural protections. Where restrictions are imposed as a disciplinary measure of institutional misconduct, the detainee must be provided notice, a hearing, and a written explanation of the disciplinary action taken.

*Tate*, 791 F. App'x at 390 (citing *Williamson v. Stirling*, 912 F.3d 154, 174-77 (4th Cir. 2018). "The level of procedural due process to which a pretrial detainee is entitled in a particular situation, however, depends on *context*. *Williamson*, 912 F.3d at 175 (emphasis added).

> If, however, a restriction imposed by the jail officials is for administrative purposes — which include managerial and security needs — the level of process to which the pretrial detainee is entitled is diminished. In those situations, the courts of appeals have generally concluded that some level of process must be afforded to the pretrial detainee, even if the process is provided after the restriction has been imposed.

*Id*.

It is undisputed that the majority of the time Lipscomb spend in segregated confinement at NRADC with severely limited privileges consisted of terms of days imposed in response to disciplinary infractions. As discussed, before imposing restrictive custody on a detainee for disciplinary reasons, officials must provide notice, a hearing, and a written explanation of the

disciplinary action taken.  *Williamson*, 912 F.3d at 174-77.  Lipscomb has not alleged facts

showing that officials denied him any of these procedural protections during the proceedings on

his individual disciplinary infractions at NRADC, before imposing terms of disciplinary

segregation.[5]

NRADC officials reclassified Lipscomb from medium to maximum custody status in

February 2020, after his first disciplinary conviction involving a weapon.  Lipscomb complains

that this status change was not preceded by procedural protections, given his pretrial detainee

status.[6]  It is undisputed, however, that from February 6 through April 26, 2020, Lipscomb

remained in segregated confinement to serve disciplinary penalties imposed only after

disciplinary procedural protections—notice, a hearing, and a written explanation.  It is also

undisputed that from July 13 to October 11, 2020, Lipscomb served consecutive disciplinary

terms of segregated confinement, after receiving the procedural protections of standard

disciplinary proceedings.  As to these time periods of disciplinary segregated confinement, the

court will grant summary judgment for the defendants as to Lipscomb's procedural due process

claims.

From April 26 to June 13, 2020, and from October 11 to October 26, 2020, Lipscomb

remained in segregated confinement under his administrative classification as a maximum

custody inmate.  The defendants have provided evidence of the factual basis and the

measurement system employed to categorize Lipscomb as maximum custody to protect others

---

[5]  Lipscomb has alleged that some of the disciplinary charges were *false*.  That assertion alone cannot
support a claim under § 1983.  "Since [Lipscomb] was granted a hearing, and was afforded the opportunity to rebut
the charges against him, [an official's alleged] filing of unfounded charges did not give rise to a *per se* constitutional
violation actionable under section 1983."  *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986).

[6]  As discussed herein, Lipscomb's status as a pretrial detainee is not clearly established in legal terms.  In a
later-filed case, *Lipscomb v. Corbin*, Case No. 7:22-cv-00181, Lipscomb has referred to himself as a pretrial detainee.
In addressing a motion in that case (Dkt. No. 30), the court adopted Lipscomb's description of himself and referred to
him as a pretrial detainee.  This mere description of Lipscomb, in an unrelated order in an unrelated case, does not
amount to a legal finding regarding Lipscomb's detainee status for purposes of the analysis in this separate case.

from an inmate whose past criminal convictions, current charges, and jail rule infractions indicated that he posed a potential risk of violence.  The defendants' evidence also indicates that NRADC administrators regularly reviewed Lipscomb's segregation status during all periods of such confinement, although Lipscomb did not receive advance notice or details about these reviews or participate in them.

Lipscomb asserts that the nature of the procedural protections provided to him while segregated under maximum security status alone does not satisfy constitutional due process requirements.  The court is satisfied, however, that the precise nature of procedural protection constitutionally required for a probationer awaiting revocation proceedings, related to more restrictive jail housing conditions, is not clearly established in this circuit.  *Brown*, 240 F.3d at 388; *Johnson*, 2010 WL 936706, at *5–6.  Because existing precedent does not place this constitutional question beyond debate, the court concludes that any rights Lipscomb may have had to additional or different procedural protections related to maximum security status during these limited time periods were not clearly established for the purposes of the qualified immunity analysis.  *White*, 137 S. Ct. at 551.  Therefore, the court will grant summary judgment on the ground of qualified immunity as to these procedural due process claims.

The defendants are also entitled to summary judgment to the extent that Lipscomb complains that the defendants violated procedural protections required by NRADC or state regulations related to segregated confinement.  Even if the defendants did not always precisely satisfy the requirements of state and local regulations, such violations of state rules do not support any constitutional claim under § 1983.  *Riccio v. County of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that state's failure to abide by its own procedural regulations is not a federal due process issue).

For the stated reasons, the court concludes that the defendants are entitled to summary judgment as to Lipscomb's procedural due process claims, either for lack of merit or on the ground of qualified immunity.  The court will grant their motion as to these claims.

## D. Retaliation

Finally, Lipscomb alleges a retaliation claim.  Specifically, he states: "On May 14, 2020, Lt. Saville stated to [him] he had no Due Process Rights, and that [he] also abused the Grievance Policy due to Filing Grievance on Long-Term Segregation.  Lt. Saville then confiscated [his] Wedding Ring in Retaliation to [his] filing the Grievance."  (Am. Compl. 4, Dkt. No. 9.)  The defendants have not addressed this claim in their summary judgment motion.  The court concludes, however, that Lipscomb's factual allegations fail to state any actionable § 1983 retaliation claim.

To succeed on a retaliation claim, whether as a pretrial detainee or a convicted felon, Lipscomb must establish that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct."  *Martin v. Duffy ("Martin II")*, 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy ("Martin I")*, 858 F.3d 239, 249 (4th Cir. 2017).  Notably, however, the Fourth Circuit has cautioned that courts must treat an inmate's claim of retaliation by prison officials "with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'"  *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).  Where an inmate bases his § 1983 claim on nothing more than a conclusory assertion of retaliation, that claim may be dismissed. *Adams*, 40 F.3d at 74–75.

As to the first element of the claim, prisoners have a "First Amendment right to be free from retaliation for filing a grievance." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). So, Lipscomb's filing of grievance documents constitutes his exercise of an activity protected by the First Amendment.

For the second element, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Because the standard is objective, rather than subjective, the fact that a plaintiff has not, in fact, been deterred from continuing in his protected activity is a factor that the court can consider. *Id.* at 500 (noting that, although it is not dispositive, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity").

Lipscomb's sparse allegations simply do not support a finding that Saville's actions on May 14, 2020, were sufficiently adverse to satisfy the second element of the *Martin II* standard. Lipscomb states only that the officer confiscated his wedding ring. Jail regulations typically restrict the type of personal property items an inmate may possess while incarcerated, particularly jewelry or other valuables. Lipscomb offers no suggestion that officials have threatened to retain his ring indefinitely. He also states no facts indicating how this property confiscation incident could deter a person of ordinary firmness from exercising his First Amendment rights in any respect. *See, e.g., Edwards v. King*, No. 7:21-CV-00047, 2021 WL 1396463, at *2 (W.D. Va. Apr. 13, 2021) (holding that confiscation of an affidavit, without more, does not constitute sufficiently adverse action to satisfy the second element under *Martin II*) (citing similar cases regarding property confiscations). Moreover, the ring incident clearly did not noticeably deter Lipscomb from exercise of his First Amendment rights. He has

continued litigating this case for months since the confiscation of his ring—evidence that is relevant to the court's determination that he has not stated facts meeting the second element of his claim. *See Constantine,* 411 F.3d at 500.

The third element of a retaliation claim requires a plaintiff to show a causal connection between the triggering First Amendment activity and the alleged adverse action. A plaintiff must put forth evidence to show that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action." *Martin II*, 977 F.3d at 300. Lipscomb has offered no such evidence. His conclusory and unsupported characterization of Saville's action as retaliatory is not sufficient to meet the constitutional standard or to warrant further development in this case. *Adams*, 40 F.3d at 74 ("plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked allegations of reprisal to survive" summary dismissal).

For the reasons stated, the court concludes that Lipscomb fails to allege facts to support the necessary elements of a § 1983 retaliation claim. Therefore, the court will summarily dismiss this claim without prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Under this statutory section, the court may summarily dismiss a claim or case at any time upon determining that it fails to state a claim upon which relief could be granted. Because it is not inconceivable that Lipscomb might be able to amend his retaliation claim successfully, the court will grant him thirty days to file a motion to reopen the case and to amend his retaliation claim with additional facts.

**E. Lipscomb's Summary Judgment Motion**

Lipscomb has filed a one-page motion demanding summary judgment in his favor, based on his assertion (absent any evidence in support) that "there is no genuine issue of material fact" on which the defendants could prevail. (Mot. Summ. J., Dkt. No. 59.) On the contrary, as to

each of the claims Lipscomb has asserted, the court has determined that the defendants are entitled to summary judgment.  Therefore, the court must deny Lipscomb's motion.

## III.  CONCLUSION

For the stated reasons, the court will grant the defendants' motion for summary judgment as to all of Lipscomb's claims and will deny Lipscomb's motion for summary judgment.

An appropriate final order will enter this day.

Entered: July 12, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge